MOCK, et al. *v.* NATCHEZ GARDEN CLUB

No. 40387          February 18, 1957          92 So. 2d 562

*William F. Riley, W. A. Geisenberger,* Natchez, for appellants.

*Laub, Adams, Forman* and *Truly,* Natchez; *Young* and *Daniel,* Jackson, for appellee.

HALL, J.

The appellants herein were plaintiffs in the lower court and brought suit against the appellee for the recovery of damages for the death of their son, Homer Mock, by reason of drowning in a swimming pool owned by the appellee and operated by it in connection with its

operation of an ante-bellum house known as Connelly's Tavern in Natchez, Mississippi, which was also owned by the appellee. At the conclusion of all the evidence for the plaintiffs the trial court sustained a motion of the defendant to exclude the plaintiffs' evidence and to peremptorily direct a jury verdict for the defendant and judgment was entered accordingly, from which this appeal is taken.

Section 1455, Code of 1942, provides that: "All questions of negligence and contributory negligence shall be for the jury to determine." We have held in cases too numerous to enumerate, that if reasonable men might have a difference of opinion as to whether on not the negligence of the actor constituted a substantial factor in bringing about the injury, then the question is for the jury. We have also held repeatedly in cases too numerous to mention that upon a motion for a directed verdict all the facts expressly testified to, and all inferences necessarily and logically to be deduced therefrom, are to be taken as true in favor of the party against whom the motion is asked, and that a case should not be withdrawn from the jury unless the conclusion follows as a matter of law that no recovery can be had upon any view which can be properly taken of the facts which the evidence tends to establish, and further that if more than one reasonable inference can be drawn from the facts the question of negligence is for the jury.

Bearing these principles in mind we shall detail the facts shown by the plaintiffs' evidence. The Natchez Garden Club is a corporation and owns Connelly's Tavern, and a short distance east thereof it also owns an artificial swimming pool which is about forty-five feet wide, extending from north to south, and about seventy-five feet in length, extending from west to east. The pool is constructed of concrete and immediately outside of and adjoining the pool there is a concrete apron or walkway extending all the way around the

pool and just outside this concrete apron there is a cyclone fence which completely encloses the pool and the walkway. The only entrance to the enclosure is at a gate on the west end. The west end is the shallow end and the east end is the deep end. At the west end there are two lights on a pole which shine upon the pool. There are no lights on either side or at the east end. There are some trees around the pool outside the fence on the north side and at the east end but some of the limbs extend over the fence and over the concrete walk. On the occasion in question there were some leaves in the water and the water was slightly discolored. According to the plaintiffs' undisputed proof one could not see well into the deep area at the east end because there were not enough lights.

Shortly before June 8, 1955, the Jefferson Street Methodist Church in Natchez had engaged the use of this pool for a swimming party for a Sunday School group from thirteen to fifteen years of age, and paid the appellee the necessary charges for reservation of the pool for this church group.

There were about twenty-one or twenty-two children who attended the party. The appellee provided a lifeguard who was sixteen years of age. Homer Mock, a fourteen year old son of the appellants, was in the group which attended the party. There were benches around the pool but the lifeguard spent most of his time on a bench at the west end of the pool. There were five adults present who chaperoned the party but none of these went in swimming. They remained most of the time at the west end of the pool, from which place neither they nor the lifeguard could see underneath the water in the deep end of the pool.

At about 9:20 P. M. one of the men who had been assigned the duty of building a fire with which to roast wieners after the swimming party went outside the fence around the pool to a barbecue pit which was near the

east end and on an approximate level with the pool. He started the fire and at about 9:45 P. M. the children were called to get out of the pool and come to the wiener roast. It was about 9:45 P. M. or a little later when all of the children except Homer Mock came out of the pool and went to the wiener roast.

After all had finished eating and most of the children had gone the man who built the fire and had attended to the roasting of the wieners went to the boys dressing room along with the lifeguard who had already dressed and then discovered the clothes of Homer Mock still in the dressing room. He immediately told the lifeguard who grabbed a flashlight and ran to the pool. According to the proof he used the flashlight because more light was needed than was afforded by the electric lights at the west end of the pool. He discovered the body of Homer Mock in the deep part of the pool near the east end and dived in and brought it to the surface, and Homer's body was removed from the pool with the assistance of the man who had discovered his clothes in the dressing room. They laid it on the concrete walkway by the south side of the pool near the west end and the lifeguard immediately started applying artificial respiration. The other man rushed to the telephone and called for the emergency truck from the fire department and it arrived shortly afterward, having been situated only about two block away. The call came in to the fire department, according to their records, at 10:39 P. M. An employee of a funeral home was called and brought oxygen equipment which was used on Homer, and a doctor was called, who arrived after the oxygen equipment, and he not only used it but also gave an injection into Homer's heart in an effort to revive him, and finally after much work pronounced him dead. A coroner's jury was empaneled which rendered a verdict of death from accidental drowning.

In 52 Am. Jur., pp. 291, 292, Theaters, Shows, Exhibitions, etc., Section 47, it is said: "It is the general rule, of almost universal acceptance, that an owner or proprietor of a theater or public amusement is bound to exercise a degree of ordinary and reasonable care for the safety and protection of his patrons—the degree of care that would be exercised by an ordinarily careful and prudent man in the same position and circumstances. Generally speaking, this obligation is met when the owner or proprietor makes the premises and instrumentalities as little dangerous as reasonable care can make them, having regard to the methods and contrivances necessarily used in conducting such a place, and, it has been said, to the activities and conduct of invitees using such place and instrumentalities in the manner which they are ordinarily used for the purposes for which they are designed and intended. Such degree of care is measured by the conduct of the average man, not that of the cautious man of more than average prudence. It has been said that 'ordinary care' is a relative term; and the duty of ordinary and reasonable care necessarily varies according to the facts and circumstances of particular cases and the conditions and circumstances of particular amusements and instrumentalities and their uses."

In 8 A. L. R. 2d p. 1315, there is an Annotation where the rule is summarized as follows: "It is said to be well settled that the owners of resorts to which people generally are expressly or by implication invited to come are legally bound to exercise ordinary care and prudence in the maintenance and management of such resorts to the end of making them reasonably safe for visitors, and that when the business is that of keeping or carrying on a bathing resort, the proprietors or owners thereof are not only required to exercise that same degree of care and prudence with respect to keeping the premises in a reasonably safe condition which the law imposes upon keepers of public resorts generally for the protection of

their patrons, but the law imposes upon them the additional duty, when the character and conditions of the resort are such that because of deep water or the rising of sudden storms or other causes the bathers may get into danger, of having in attendance some suitable person with the necessary appliances to effect rescues and save those who may meet with accidents, and that it is not only the duty of such owners to be so prepared to rescue those who may get into danger while bathing, but it is their duty to act with promptness and to make every reasonable effort to search for, and, if possible, recover those who are known to be missing.''

In 48 A. L. R. 2d, the annotator refers to 52 Am. Jur and says: ''Thus, it has been stated that the owner or operator of a bathing resort or swimming pool is bound to use ordinary, due, or reasonable care for the safety of patrons, or to guard against injury to them; and that he must use due or reasonable care, or must exercise vigilance, to provide a safe place, or safe accomodations, or to maintain the premises in a safe condition.''

In the case of Meridian Amusement Concession Company v. Roberson, 188 Miss. 136, 193 So. 335, we held that it was a question of fact for the jury whether a child who had been drowned in a swimming pool lost its life through the negligence of the lifeguards, and the Court said: ''The indication from the evidence is that if they had used reasonable care in looking after the safety of the child he would not have drowned.''

We think that under the facts of this case it was a question for the jury to say whether or not the lights at the pool, placed as they are, were sufficient to make the pool reasonably safe for swimmers, and further that it was a question for the jury to say whether the child in this case lost his life by reason of the negligence of the lifeguard provided by appellee. The judg-

ment of the lower court must therefore be reversed and the cause remanded for a new trial.

Reversed and remanded.

*McGehee, C. J.,* and *Kyle, Arrington* and *Gillespie, JJ.,* concur.